UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

NANCY MITCHELL,

                     Plaintiff,

-v-

YOUNG ADULT INSTITUTE,

                     Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 17 2012

11 Civ. 06222 (AJN)

<u>ORDER</u>

ALISON J. NATHAN, District Judge:

      Defendant Young Adult Institute, Inc. (YAI) has moved for summary judgment in this Age Discrimination in Employment Act (ADEA) case. Plaintiff, Nancy Mitchell, brings a single cause of action in this matter alleging that she was terminated by her employer, Young Adult Institute, Inc., (YAI), because of her age. YAI contends that judgment as a matter of law is appropriate because Plaintiff cannot make a prima facie showing of age discrimination, YAI had legitimate reasons for terminating Mitchell, and that Mitchell cannot demonstrate pretext. The Court agrees with YAI and GRANTS the motion for summary judgment.

### I. FACTS

#### A. Background

      YAI is a not-for-profit health and human services agency for people with developmental and learning disabilities ("Consumers") which, among other things, provides Consumers with activities in the community such as delivering food to homebound seniors. (Def. Ex. C ¶¶ 2, 6; *see also* Pls. Ex. 1 at 37-38). Mitchell became a Community Training Specialist ("CTS") with YAI in April 2000. (Pl. Opp. at 2; Def. SMF at ¶ 11; Def. Ex. E at 37). A CTS is responsible for

managing and monitoring four or five Consumers during each day that the Consumers are out in the community conducting volunteer work. (Def. Ex. K; Pls. Ex. 1 at 87, 99).

At the time of her termination, Mitchell was formally supervised by Suzanne Ledesma. (Def. Ex. E at 57-58; Pls. RSMF ¶ 1). Mitchell contends that at this time she was also supervised by Allison Cotie and Thelma King, the allegedly biased individuals in this case. (Pls. RSMF ¶ 1). Mitchell's testimony suggests that Cotie and King, even if not formally her supervisors, acted in a supervisory capacity over Mitchell at the time of the events at issue. (*See* Pls. RSMF ¶ 1 (citing the Pls. Ex. 3 at 20); Def. Ex. E at 57-58; Pls. Ex. 1 at 126, 175-76). YAI contends that Ledesma, not Cotie or King, was Plaintiffs' supervisor, but does not dispute that Cotie and King are program supervisors. (Def. SMF ¶¶ 7-8, 12; *see also* Def. Ex. G at 8-9; Def. Ex. H at 7).

### B. Alleged Discriminatory Comments

According to Mitchell, Cotie and King made derogatory comments regarding Mitchell's age. Mitchell testified that King would "say things to me in reference to my age, to my clothing, and to my health." (Pls. Ex. 1 at 75). Specifically, Mitchell testified that King commented on Mitchell's food, saying that Mitchell was "too old to be eating that stuff. You are going to mess around and have a heart attack"; that in response to Plaintiff's request not to be sent up and down hills for work, King said that there "[a]in't nothing the matter with your knee . . . . If your knee is hurting you stay home. You just getting old"; and that she was too old to be wearing certain clothing and that she was a "ghetto grandmother." (Pls. Ex. 1 at 75-76, 172). Mitchell testified that, at least with regard to Mitchell's food, King was making such comments "constantly." (Pls. Ex. 1 at 76-77). According to Mitchell, King also once stopped Mitchell in the hallway and asked her age. (Pls. Ex. 1 at 78).

Mitchell also testified that in roughly May 2009, the employees of YAI were changing offices due to construction, and that she refused to switch offices. (Pls. Ex. 172-175). According to Mitchell, King told her that "you are going to leave here if it kills me, and if you don't leave you [are] only setting yourself up to be fired." (Pls. Ex. 1 at 174). At this time, according to Mitchell, King also told Mitchell "out with the old, in with the new." (Pls. Ex. 1 at 172-173, 174-175).

As to Cotie, Mitchell testified that, during a lunch with Cotie and another YAI employee to celebrate Mitchell's 50th birthday, Cotie and that employee remarked that Mitchell was the oldest staff member at YAI and was getting old. (Pls. Ex. 1 at 78-79). According to Mitchell, Cotie also referred to her as "old reliable" because "you can handle any situation[;] that is why I go to you when I need things." (Pls. Ex. 1 at 170, 175-176). Although Mitchell did not consider the epithet a compliment, she testified that she "got used to" Cotie using the term and that she told Cotie she could "go ahead" and refer to her that way. (Pls. Ex. 176). Mitchell also testified that King and Cotie, among others, would tease her about her hot flashes, and refer to their age in doing so. (Pls. Ex. 1 at 169-172).

Cotie denies making any such comments. (Def. Ex. G at 32-33). King denies that she made comments regarding Mitchell's food or that she told Mitchell "out with the old, in with the new" but testified she did write Mitchell up on one occasion for not being dressed appropriately for work. (Def. Ex. H at 21-22, 25, 29).

### C. Mitchell's Job Performance

Sometime in 2009, Mitchell was relieved of her duties to fill out certain paperwork, with the exception of at least her "daily notes"—also known as "Response to Service Comments"—which she was still required to fill out at the end of each day. (Pls. Ex. 1 at 48-49, 50-53, 70-72;

Def. Ex. H at 41). YAI contends that Mitchell was relieved of her paperwork duties due to her poor performance in filling out the relevant paperwork. (Pls. Ex. 1 at 68-70; Def. Ex. F at 31-32; Def. Ex. H at 41, 53; Def. Ex. L; Def. Ex. M). Although Mitchell admitted in her deposition that she had some issues regarding timely submission of that paperwork, she otherwise denied that the reason she was relieved of her paperwork duties was due to her poor performance in filling out such paperwork. (Pls. Ex. 1 at 68-72).

### D. Events Underlying Mitchell's Termination

On November 2, 2010, Mitchell met with her Consumers to take them out into the community for their daily volunteer activities. (Pls. Ex. 1 at 124). However, because the volunteer site where Mitchell and the Consumers were to report was closed, Mitchell was directed to shadow one of the other staff, Kenneth Brokinaw, whose volunteer activity was to deliver food to home-bound seniors. (Pls. Ex. 1 at 125-128, 159.) Mitchell, Brokinaw, and two other YAI employees, along with their Consumers, left together to pick up the food for distribution. (Pls. Ex. 1 at 128-130.) Because one of Mitchell's Consumers had ambulatory problems and walked slowly, at one point Brokinaw's group went ahead of Mitchell and her Consumers. (Pls. Ex. 1 at 133-34). When Mitchell caught up with Brokinaw, he was outside the volunteer site with two of his Consumers and, when Mitchell asked where the other two of Brokinaw's Consumers were, he told her that his other two Consumers were inside the volunteer site and would be "right down in a minute." (Pls. Ex. 1 at 136-137). Mitchell accompanied Brokinaw on his remaining delivery, and returned to the YAI offices. (Pls. Ex. 1 at 138-139, 159-163).

It is undisputed that Brokinaw violated YAI policies in allowing two Consumers out of his sight while engaging in their volunteer activities, and that such conduct constituted neglect.

(Def. SMF at ¶ 24; Def. Ex. G at 37; Def. Ex. Q; Pls. Opp. at 3-4; Pls. Ex. 1 at 140, 144-145, 155; Def. Ex. C at ¶ 8). The evidence further demonstrates that Mitchell was required to report her observations of Brokinaw's misconduct in failing to monitor his Consumers. (*See* Pls. Opp. at 3-4; Pls. Ex. 1 at 55, 140-41; Def. SMF at ¶ 32; Def. Ex. C at ¶¶ 8, 12; Def. Ex. G at 26).

Mitchell testified that she made several efforts to report this misconduct in a timely manner. According to Mitchell, when she returned to YAI at 12:30 pm, she tried to locate the YAI supervisors, but was told they were in a meeting. (Pls. Ex. 1 at 140-41). At about 1:30 pm, Mitchell knocked on the door where the meeting was occurring and told Cotie that she needed to speak to her but Cotie told Mitchell that she could not speak at that time and directed Mitchell to go perform certain other duties. (Pls. Ex. 1 at 142-143).

At about 2:45 pm, Mitchell again attempted to speak with Cotie and was told she was still in a meeting. (Pls. Ex. 1 at 143). By this time, however, Cotie had already learned about the incident involving Brokinaw's failure to monitor his consumes from two other staff members. (Def. Ex G at 19; *see also* Def. Ex. C at ¶¶ 8-9). While Mitchell was waiting in the area for Cotie to become available, she overheard a telephone call in which Cotie was talking to Paul Smoller, the Senior Director of YAI's "Day Services" program, about this incident. (Pls. Ex. 1 at 145; Def. Ex. C at ¶ 8). According to Mitchell, she overheard Smoller tell Cotie to bring Mitchell in to explain what had happened, to which Cotie responded that Mitchell "was going to act like a dummy" and that Cotie did not want to talk to Mitchell.[1] (Pls. Ex. 1 at 145). Shortly thereafter, Mitchell met with Cotie and King, and after Cotie asked what had happened that day, Mitchell then told them that she had trailed Brokinaw and observed him failing to monitor his Consumers. (Pls. Ex. 1 at 144-145, 150-151; Def. Ex. G at 19).

---
[1] King was also present for this conversation. (Pls. Ex. 1 at 152; Def. Ex. C at ¶ 8).

Mitchell later summarized the incident with Brokinaw in writing for the YAI human resources department, describing her activities as "trail[ing] [Brokinaw's] group from a distance." (Pls. Ex. 1 at 153-157; Def. Ex. Q). On the day of the incident, Mitchell also filled out her "Response to Services Comments," summarizing the activities of her Consumers:

> Today [LT] did a great job with her communication skills[,] she worked as a team amongst her peers at a volunteer site delivering for house bound seniors. And when she participated in the group opening and closing she would assist her peers with information that pertain to the volunteer site and task. Staff praised [LT] for working on her service and for having a great day.
>
> Today when [FR] was participating in the group opening she was able to pick one of her male peers she would like to work with. Staff praised [FR] for working on her service and for having a great day.
>
> Today [T] was able to practice being professional throughout the day. [T] remain professional when participating in the group opening/closing and when he participated in the group task. Staff praised [T] for working on his service and for having a great day.
>
> Today when [J] was participating in the group opening he advocated to staff that he needed to purchase a drink for lunch. Staff praised [J] for working on his service and for having a great day.

(Pls. Ex. 1 at 161-163; Def. Ex. P). It is undisputed that LT and T did not themselves deliver the food to the home-bound seniors, but Mitchell testified that when she wrote these comments she specifically chose to describe her consumers as "participating" in these activities and "never said not one of them delivered food that day because I didn't see it." (Pls. Ex. 1 at 161-163). Mitchell has acknowledged that it is important to keep accurate records of the Consumer's activities, including for Medicaid billing purposes. (Pls. Ex. 1 at 48-49, 54).

### E. Mitchell's Termination

Smoller attests in his declaration that he received a telephone call from Cotie and King on November 2, 2010, in which King and Cotie informed him that two staff members had seen

6

Brokinaw fail to properly monitor his Consumers, and had seen Mitchell in the area as well. (Def. Ex. C at ¶ 8-9; *see also* Pls. Ex. 3 at 18-19). Smoller advised Cotie and King to speak to Mitchell about the incident, and later learned that Mitchell did not report Brokinaw's neglect "until confronted by Ms. King and Ms. Cotie." (Def. Ex. C at ¶¶ 10-11).

Smoller also requested and received documentation relating to Mitchell including Mitchell's Response to Service Comments from November 2, 2010, and the statement she drafted for the human resources department about the incident that day. (Def. Ex. C at ¶ 13). This documentation was also sent to Dory Wheatley-Higgins, Director of Day Services at YAI, who is responsible for ensuring that such documents are accurate and comply with the applicable rules and regulations. (Def. Ex. C at ¶ 13; Def. Ex. D at ¶ 1-2, 6).

Smoller and Wheatley-Higgins reviewed the Response to Service Comments and Mitchell's statement and concluded that the Response to Service Comments "stated that Ms. Mitchell's group participated in the group activity of delivering food to homebound seniors" and were contradicted by her statement that she "trailed Kenneth Brokinaw's group." (Def. Ex. C at ¶¶ 14-15; Def. Ex. D at ¶¶ 7-8). Smoller and Wheatley-Higgins concluded that "trailing another group did not constitute participating in delivering food to homebound seniors." (Def. Ex. C at ¶¶ 15; Wheatley Higgins Decl. at ¶¶ 7-8; *see also* Def. Ex. F at 41; Def. Ex. G at 28-30; Def. Ex. H at 47-51).[2] Based on this information, Smoller decided to terminate Mitchell for failure to report neglect and falsifying her Response to Service Comments. (Def. Ex. C at ¶ 15). YAI "did not bill Medicaid for the services provided on that day pertaining to Ms. Mitchell's group." (Def. Ex. C at ¶ 16; Def. Ex. G at 30).

## II.   DISCUSSION

---

[2] Cotie and King were not involved in these discussions. (Def. Ex. G at 30-31; Def. Ex. H at 32).

A. **Legal Standard**

Summary judgment is proper only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Ramos v. Baldor Specialty Foods, Inc.*, __ F.3d __, 2012 U.S. App. LEXIS 14333, at *9 (2d Cir. July 12, 2012). In reviewing the evidence on a motion for summary judgment, courts are to construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* A fact is material if it might affect the outcome of the suit under the governing law and an issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

Claims under the ADEA are evaluated under the three-step burden shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). Under this test, a plaintiff bears the initial burden of establishing a prima facie case of age discrimination. *Id.* If the plaintiff does so, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its adverse action. *Id.* Once such a reason is provided, a plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was, in fact, the result of discrimination. *Id.*

Under the Supreme Court's decision in *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2350-2351 (2009), it is not sufficient for an ADEA plaintiff to merely show that age was a motivating factor in the adverse employment decision. *Id.* Rather, an ADEA plaintiff carries the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action. *Id.*; *see also Gorzynski*, 596 F.3d at 106 (applying *McDonnell Douglas* burden shifting framework post-*Gross*, noting that the Court was still bound by this framework and saw no reason to jettison

it, but noting that *Gross* required showing but-for causation rather than merely that an adverse employment action was motivated at least in part by age discrimination).

To demonstrate a prima facie case of age discrimination, Mitchell must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. YAI does not dispute any of the first three criteria for establishing a prima facie case of age discrimination, but argues that Mitchell cannot show that her termination occurred under circumstances giving rise to an inference of discrimination. (Mot. at 16-18).

Importantly, Plaintiffs' case for age discrimination hinges on the alleged bias of King and Cotie, rather than Smoller, the individual who actually made the decision to terminate Mitchell. Plaintiff therefore relies on a "cat's paw" theory of discrimination, arguing that Cotie and King influenced Smoller's determination, including by "incorrectly reporting the underlying incident to . . . Smoller." (Pls. Opp. at 15). In other words, Mitchell seeks to hold her employer liable for the animus of her supervisors, King and Cotie, because they influenced—even though they did not make—the adverse employment decision. *See Veeramathu Rajaravivarma v. Bd. of Trs. for the Conn. State Univ. Sys.*, No. 09-cv-1550, 2012 U.S. Dist. LEXIS 40848, at *53-60 (D. Conn. Mar. 26, 2012). In particular, Mitchell's theory of the case is that King and Cotie's discriminatory animus led them to deliberately prevent Mitchell from timely reporting the neglect Mitchell observed while, at the same time, King and Cotie relayed this failure to report to Smoller as malfeasance in an effort to have her fired. (Pls. Opp. at 10-12).

The Supreme Court recently recognized the viability of "cat's paw" liability in a case arising under the Uniformed Services Employment and Reemployment Rights Act (USERRA),

9

which prohibits anti-military discrimination. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190-91 (2011). In that case, Staub's direct supervisors allegedly held an anti-military animus and had, according to Staub, falsely issued a "Corrective Action" against him, but the actual decision to terminate him was made by the vice president of human resources, relying at least in part on the Corrective Action. *See id.* The Supreme Court held that "[a]nimus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct." *Id.* at 1192. The Court further explained that

> the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect."

*Id.* Moreover, even if the decision-maker conducts an independent investigation, if the biased supervisor's action is a proximate cause of the termination, the employer remains liable. *Id.* at 1193. Thus, the Court held that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.*

Since *Staub*, a number of decisions have extended its holding on cat's paw liability to other contexts, including ADEA cases. *See, e.g., Simmons v. Sykes Enters.*, 647 F.3d 943, 949-50 (10th Cir. 2011); *Daniels v. Pioneer Cent. Sch. Dist.*, No. 08-cv-767S, 2012 U.S. Dist. LEXIS 55964, at *8-12 (W.D.N.Y. Apr. 20, 2012); *Baron v. Maxam North Am., Inc.*, No. 11-cv-198, 2012 U.S. Dist. LEXIS 52315, at *15-21 (D. Conn. Apr. 13, 2012); *Herbert v. Nat'l Amusements, Inc.*, No. 08-cv-1945, 2012 U.S. Dist. LEXIS 7392, at *1-8 (D. Conn. Jan. 23,

10

2012); *cf. Nagle v. Marron*, 663 F.3d 100, 118 (2d Cir. 2011) (noting that the Second Circuit has neither accepted or rejected the cat's paw approach). In the ADEA context, courts have required the more stringent showing under *Gross* that the discriminatory animus was a but-for cause of the plaintiff's termination, rather than just a motivating factor as in the USERRA context. *See, e.g., Simmons.*, 647 F.3d at 949-50 (applying *Staub*, noting that "an ADEA plaintiff seeking to hold an employer liable through the discriminatory conduct of its subordinate must show the subordinate's animus was a 'but-for' cause of the adverse employment action, i.e. it was the factor that made a difference."); *Daniels.*, No. 08-cv-767S, 2012 U.S. Dist. LEXIS 55964, at *8-12; *Herbert*, No. 08-cv-1945, 2012 U.S. Dist. LEXIS 7392, at *1-8 (explaining that the analysis in *Simmons* is persuasive and applying a "but for" causation standard in the cat's paw context that required the plaintiff to demonstrate that the acts of the allegedly biased supervisor were the but-for cause of the termination). In addition, courts have relied on *Staub* to identify limiting principles on imposing liability under a cat's paw theory, including (1) that the supervisor intends his or her acts to cause the adverse employment action; (2) that the biased individual is a supervisor of the plaintiff; and (3) that the supervisor is acting within the scope of his employment or liability otherwise should be imputed to the employer. *See Staub*, 131 S. Ct. at 1193; *Abdelhadi v. City of New York*, No. 08-cv-380, 2011 U.S. Dist. LEXIS 85606, at *12-13 (E.D.N.Y. Aug. 3, 2011) ; *see also Baron*, No. 11-cv-198, 2012 U.S. Dist. LEXIS 52315, at *15-21.

### B. Plaintiff's Prima Facie Case

The Court's first consideration under the *McDonnell Douglas* test is whether Plaintiff has alleged a prima facie case of discrimination. As noted above, Defendant's only argument on this

point is that Plaintiffs have failed to show that the adverse employment action taken against Mitchell occurred under circumstances giving rise to an inference of discrimination.

On the evidence before the Court, Mitchell has failed to make a prima facie showing of discrimination as to Cotie. At most, the evidence reflects that Cotie once remarked on Mitchell's age on her birthday, may have referred to her as "old reliable," and may have occasionally teased her about her hot flashes. Such stray remarks cannot, without more, get a discrimination suit to a jury. *See Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998); *see also Godfrey v. Ethan Allen, Inc.*, No. 96-7978, 1997 U.S. App. LEXIS 12334, at *8-9 (2d Cir. May 23, 1997) (unpublished) ("Nor does Quinn's remark, 'that's what happens when you get old, you get forgetful,' made in response to Podovani's speaking aloud to herself, suggest age discrimination, as the comment was an off-hand remark unrelated to any hiring or firing decision."); *Peterson v. Long Island R.R. Co.*, No. 10-cv-480, 2012 U.S. Dist. LEXIS 85054, at *31 (E.D.N.Y. June 19, 2012);*Payne v. N.Y. City Police Dep't*, No. 08-cv-3993, 2012 U.S. Dist. LEXIS 43031, at *35 (E.D.N.Y. Mar. 28, 2012) (stray remarks are insufficient to make out a claim of discrimination absent other indicia of discrimination); *Jowers v. Family Dollar Stores, Inc.*, No. 09-cv-2620, 2010 U.S. Dist. LEXIS 91581, at *9-10 (S.D.N.Y. Aug. 16, 2010) (explaining that stray remarks cannot establish a prima facie case of discrimination and that there must be a direct link between the plaintiff's membership in a protected class and an adverse employment action in order to infer discriminatory animus); *cf. Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (explaining that the Second Circuit's holdings that "stray remarks" are legally insufficient to prove discrimination was "an attempt—perhaps oversimplified by generalization—to explain that the remote and oblique the remarks are in relation to the employer's adverse action, the less they prove the action was motivated by discrimination."). Here, Mitchell has presented no

12

evidence of comments by Cotie that suggest an invidious bias or any suggestion of a link between these comments and the decision to terminate her. These comments cannot be assigned sufficient weight to give rise to an inference of discrimination on Cotie's part.

The evidence as to King is more suggestive of bias in that the comments that she made appear to be more pervasive and derogatory than those made by Cotie, and, in particular, at least one of those comments—"out with the old, in with the new"—was allegedly made in the context of threatening to terminate her employment. Although the showing of animus on King's part is far from overwhelming, drawing all reasonable inferences in Mitchell's favor, she has satisfied the low threshold to establish a prima facie case of discrimination as to King. *See Altomare v. Wells Fargo Sec., LLC*, No. 09-cv-9702, 2012 U.S. Dist. LEXIS 19209, at *23 (S.D.N.Y. Feb. 15, 2012) (explaining that plaintiff must merely satisfy a "low threshold" to show discriminatory animus and that the import of age related comments was an issue for the jury in that case); *see also Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162-163 (2d Cir. 2001) (finding direct evidence of discriminatory animus based on comment by supervisor who had "enormous influence in the decision-making process" that if the plaintiff did not follow instructions, she would be replaced with someone "younger and cheaper"); *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 363 (S.D.N.Y. 2007); *cf. Tomassi*, 478 F.3d at 115.

### C. YAI's Proffered Non-Discriminatory Reasons for Termination

Next, the Court considers whether YAI has proffered legitimate, non-discriminatory reasons for Mitchell's termination. YAI asserts that Smoller had such reasons for terminating Mitchell relating to her poor job performance arising from the events on November 2, 2010. In particular, YAI asserts that Mitchell committed several "egregious infractions" including "not reporting neglect and falsifying Medicaid documents." (Def. Br. at 18). These are the reasons

13

that Smoller gives for Mitchell's termination, asserting that he "decided to terminate Ms. Mitchell's employment for failure to report neglect and falsifying her Responses to Service Comments on that day." (Def. Ex. C at ¶ 15). Thus, YAI has proffered legitimate, non-discriminatory reasons for Mitchell's termination.

### D. Pretext/Cat's Paw Liability

Finally, under the *McDonnell Douglas* test, the Court must consider whether Mitchell has adequately demonstrated that YAI's proffered reasons for her termination were a pretext for impermissible discrimination. Mitchell argues that, regardless of Smoller's asserted non-discriminatory reasons for her termination, age discrimination was a but-for cause of her termination under a cat's paw theory of liability. *See Staub*, 131 S. Ct. at 1193. Fatal to this argument, however, is that Mitchell's theory of cat's paw liability addresses only *one* of the two proffered non-discriminatory reasons that Smoller decided to terminate Mitchell, failure to report neglect. The record contains no evidence that discriminatory animus influenced Smoller's other basis for terminating Mitchell, her falsified paperwork.

There is neither any evidence in the record nor any allegation that suggests that Smoller personally harbored any age-related bias against Mitchell. Nor does the record contain any evidence that King or Cotie, the allegedly biased individuals, influenced Smoller's conclusion that Mitchell incorrectly reported her activities on November 2, 2010, or falsified her paperwork.[3] Rather, Mitchell's argument is merely that King and Cotie reported the underlying neglect to Smoller, not that they influenced Smoller's determination of the accuracy of Mitchell's paperwork. (Opp. at 4, 10, 12, 15-17). Moreover, Smoller and Wheatley-Higgins

---

[3] The evidence that Plaintiff points to that Cotie and King were involved in her termination suggests that although they reported the underlying incident to Smoller, they were not involved in Smoller's determination that Mitchell's paperwork was inaccurate or false. (Pls. Ex. 3 at 18-31; Pls. Ex. 5 at 19-25; Pls. Ex. 6 at 32-37, 46-53, 59-63).

14

both attest in their declarations that they independently reviewed Mitchell's Response to Service Comments and determined them to be false, relying on Mitchell's own statement of what occurred on November 2, 2010, to determine the veracity of her Response to Service Comments. (Def. Ex. C at ¶¶ 13-16; Def. Ex. D at ¶¶ 6-9). *See id.*; *Simmons.*, 647 F.3d at 950 (10th Cir. 2011).

As such, there does not appear to be a genuine dispute that Smoller had an independent, non-pretextual reason to terminate Mitchell's employment. Although Mitchell argues that her error was "de minimis," the evidence in the record suggests that Smoller and Wheatley-Higgins, neither of whom is alleged to be biased, viewed the error as "falsific[ation of] her Response to Service Comments" warranting her termination, and that the error prevented them from billing Medicaid for Mitchell's Consumers' activities on November 2, 2010. (Def. Ex. C ¶¶ 13-16; Def. Ex. D ¶¶ 6-9). Moreover, Mitchell's argument that this error was "de minimis" and should be discounted by the Court fails because "[a]bsent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 290 (S.D.N.Y. 1999); *see also Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 289 (E.D.N.Y. 2010); *LaBella v. N.Y. City Admin. for Children's Servs.*, No. 02-cv-2355, 2005 U.S. Dist. LEXIS 18296, at *49 (E.D.N.Y. Mar. 11, 2005). There is no record evidence sufficient to create a genuine dispute as to whether Mitchell's falsified paperwork—as Smoller, a non-biased decision-maker, viewed it—was an independent, unbiased reason to terminate her employment. As a result, there is insufficient evidence to create a genuine dispute of fact that age-related bias was a "but-for" cause of Mitchell's termination.

Even assuming that an inference were available that Mitchell's falsified paperwork was not a sufficient basis to terminate her employment, Mitchell's cat's paw theory fails on its merits. There is essentially no evidence in the record that age-related animus motivated Cotie and King to prevent Mitchell from reporting the neglect she observed or led them to misreport any facts to Smoller. Indeed, the evidence in the record suggests only that Mitchell was unable to meet with Cotie and King before they contacted Smoller, not that King and Cotie conspired to prevent her from reporting the incident. (*see supra* Section I.D; Pls. Br. at 4, 10-12, 15-17).

Although Mitchell may have overheard a comment by Cotie suggesting she did not want to speak with Mitchell because she would "act like a dummy," as described above there is not sufficient evidence to establish an inference of age-related bias on Cotie's part. *See, e.g., Staub*, 131 S. Ct. at 1193 (holding that the supervisor's act must be motivated by animus); *Valentine*, 50 F. Supp. 2d at 290. In the absence of sufficient evidence to suggest that Cotie was motivated by age-related animus, this comment does not suffice to avoid summary judgment because it does not establish impermissible discrimination motivated Cotie's actions. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("The ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age.").

In attempting to withstand a properly supported motion for summary judgment, "a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age was the real reason for the discharge" and it is not enough to merely present "*some* evidence" of bias. *Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 470 (2d Cir.

2001); *Criley v. Delta Air Lines*, 119 F.3d 102, 105-06 (2d Cir. 1997); *Centeno v. New York City*, No. 02-cv-2745, 2005 U.S. Dist. LEXIS 41895, at *25 (E.D.N.Y. May 12, 2005). On the record before the Court, the evidence is not sufficient to support a rational finding that it is more likely than not that Mitchell was actually discharged due to age discrimination, rather than the legitimate reasons articulated above.

Defendant's motion for summary judgment is GRANTED.

SO ORDERED:

Dated: August 17, 2012
New York, New York

_____
ALISON J. NATHAN
United States District Judge